[Civ. No. 906.     Second Appellate District.—March 20, 1911.]

ERNEST V. COWELL, SAMUEL H. COWELL, ISABELLA M. COWELL, and HELEN E. COWELL, Appellants, v. FERD SNYDER and FERD SNYDER, Jr., Partners Doing Business Under the Name of FERD SNYDER & SON, and Also Under the Name SNYDER LIME COMPANY, Respondents.

LANDLORD AND TENANT—LEASE—HOLDING OVER AFTER TERM—NOTICE OF INCREASE OF RENT—VARYING EFFECT OF ACQUIESCENCE AND DISSENT.—Where a landlord seasonably gives notice to his tenant for years that the terms of the lease with respect to the amount of rental will be increased if he continues to occupy the property beyond the expiration of his term, if he does not manifest his refusal to be bound by such new terms, he will be deemed to have acquiesced in the changed contract and become bound by it. But if, in such case, the tenant announces that he will not accept the new terms, no agreement results between the parties, and the tenant holding over may be treated as a trespasser, and is liable to the landlord for the reasonable value of the use and occupation.

ID.—ELECTION OF LESSORS.—The lessors, in case of refusal of the lessees to comply with the terms of a new lease, may elect to treat them either as trespassers or as tenants at his option. Very slight acts on the part of the lessors, or a short lapse of time, are sufficient to conclude their election and make the occupants their tenants, and if they do so, no greater rent can be demanded than before such election.

ID.—ACCEPTANCE ON FORMER RENTAL ACCOUNT—ESTOPPEL OF LESSORS.—Where the lessors accepted money past due on the former rental account, during a current year, and after the expiration of another year did likewise, and continued to accept money any time at the former rates, by so doing, they adopted the defendants as continuing tenants, and estopped themselves from asserting any change in the lease contract.

ID.—RIGHTS OF LESSEES TO WORK LIME QUARRIES OPENED.—In the absence of a special limiting agreement, a lessee of lands for years or at will has a right to the product of the soil and to work any quarries open at the commencement of his tenancy, under section 819 of the Civil Code. Where the plaintiffs expressly alleged in their complaint that the land was leased for farming purposes, and that the defendants' lessees were to have the right to quarry lime rock on said lands, such right was expressly incident to the lease.

ID.—CHANGE OF TERMS OF SHIPPING LIME ROCK QUARRIED.—Where the lease provided for shipping lime rock quarried at $9 per ton f. o. b. at the station for the lessees, and upon proposal of the lessors it was agreed that it should be shipped to San Francisco at $12 per ton, and the expense of transportation should be charged back, the lessors became bound to accept payment at the latter rate stated, subject to adjustment of accounts for transportation.

ID.—IMPROPER DETERMINATION OF REASONABLE VALUE.—The court improperly determined that the lime rock furnished under such agreed rule was to be paid for by plaintiffs according to the reasonable value thereof.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Leon F. Moss, Judge.

The facts are stated in the opinion of the court.

Olney, Pringle & Mannon, for Appellants.

Leonard B. Slosson, for Respondents.

JAMES, J.—Plaintiffs appeal from a judgment in favor of defendants entered against them for the principal sum of

$1,673.30, and from an order denying their motion for a new trial.

In the year 1904 defendants leased from plaintiffs certain land situated at Tehachapi, in Kern county, for the term of one year, ending on the first day of December, 1905. The yearly rental stipulated to be paid therefor was the sum of $300. The lease was in writing, and further provided that the land was rented for farming purposes, but that the defendants were to have the right to quarry lime rock on said lands for the purpose of manufacturing lime therefrom, for which privilege they were to pay an additional sum of five cents per barrel for all lime so manufactured from said rock. Defendants entered into possession of the land and manufactured lime from the rock taken therefrom up to the first day of December, 1907. Upon the expiration of the term during which the lease provided the defendants should hold and use the land, plaintiffs notified defendants that if they continued thereon thereafter, and continued to quarry lime rock from the land and manufacture lime, that the annual rental would be the sum of $500, and that the additional sum to be paid for the lime rock taken from the quarry would be ten cents per barrel for all lime manufactured. Plaintiffs by their action sought to recover a balance of $3,613.80, alleged to be due them on account of rental and lime manufactured by defendants during the years 1906 and 1907, claiming that during these years the defendants held under the lease contract as modified, by which the compensation to be paid to plaintiffs was increased as before mentioned. Defendants by their answer denied that they ever acquiesced in or agreed to the changed terms of the lease contract, and asserted that during the time that they held possession of the land and used the same their holding was under the original lease and all the terms thereof, and not otherwise; and by way of counterclaim set up a cause of action for lime furnished to plaintiffs. The finding of the court was in favor of the contention of defendants that there had been no change made in the lease contract as to money to be paid by them for the use of the property. There was but slight controversy at the trial as to the quantity of lime furnished by defendants to plaintiffs, which was made the subject of the counterclaim, the dispute being, mainly, upon the question as to the amount

to be paid by the plaintiffs therefor, plaintiffs contending that they were to pay $9 per ton f. o. b. Tehachapi for all of the lime so furnished, while defendants maintained, and the court found, that plaintiffs were liable for the reasonable value of all lime furnished in excess of three carloads. The amount of the judgment was arrived at by crediting upon the rental account, according to the terms of the original lease, the value of so much of the lime as was sufficient to extinguish that account, and providing that defendants should recover from plaintiffs the excess, which, as before stated, amounted to the sum of $1,673.30.

In the bill of exceptions is set out a great deal of the correspondence which was carried on between the plaintiffs and defendants during the years 1906 and 1907. In these letters, commencing early in the year 1906, were statements addressed to the defendants by plaintiffs, notifying the former that their lease on the Tehachapi ground had expired, and that if they wished to make arrangements for the ensuing year, they should adjust their account for the preceding year, which was then overdue and upon which they were in arrears. In several of these letters written by the plaintiffs, defendants were distinctly notified not to take any more rock from the ground, and that if they did so and continued in possession of the property, it would be at the new rate of compensation, to wit, $500 per year, and ten cents per barrel for all lime manufactured. Notwithstanding these letters, the defendants continued in possession and manufactured lime, not only during the year 1906, but during 1907, also, and up to the first day of December of that year. It would appear that plaintiffs had great difficulty in procuring a settlement of their account held against the defendants, and as late as August, 1906, defendants were still in arrears on account of money provided to be paid under their lease, which should have been paid during the year 1905. It is the contention of plaintiffs that after receiving notice of the changed terms of the lease, by continuing in possession of the land and working the quarry, defendants manifested their acquiescence in those new terms, and became bound to make payment as compensation for the use of the real property and the lime rock taken therefrom at the new rate. The court expressly found that defendants did not acquiesce in the proposal of

plaintiffs to change the terms of the hiring of the property, and this finding is evidently made upon the testimony of the defendants, who testified that in 1906 they notified plaintiffs that they would not make payment according to the new rate as demanded. The text-writers agree, and it seems to be settled by the authorities, that where a landlord seasonably gives notice to his tenant for years, that the terms of the lease with respect to the amount of rental will be changed in the event the tenant continues to occupy the property beyond the expiration of his term, and the tenant does so continue to occupy the property, and does not manifest his refusal to be bound by such new terms, that by his silence he will be deemed to have acquiesced in the changed contract and become bound by it. But the cases also hold that where a tenant holding over beyond the expiration of his term announces that he will not accept the new terms proposed by his landlord, no agreement results and, therefore, no contract by which the new terms become operative between the parties. In such a case, where the landlord does not receive the rental from the tenant, the tenant becomes, in effect, a trespasser and liable to the landlord for the reasonable rental value of the premises so occupied by him to be collected as damages. This is the general rule. We quote: "A tenant for years who holds over after the expiration of his term, without paying rent or otherwise acknowledging a continuance of the tenancy, becomes either a trespasser or a tenant, at the option of the landlord. Very slight acts on the part of the landlord, or a short lapse of time, are sufficient to conclude his election and make the occupant his tenant. But the tenant has no such election; his mere continuance in possession fixes him as tenant for another year, if the landlord so elects, although the tenant has refused to renew the lease and given notice that he has hired other premises. . . . He remains a tres-passer, and can only become a tenant by mutual agreement. A holding over after a notice from the landlord that if the tenant remains it will be at certain terms is an acceptance of those terms. . . . Notice being given to the tenant that if he occupied beyond the subsisting term he must pay an increased rent, naming the sum, the tenant, although he held over, was held not bound to pay the increased rent unless he assented. But such assent may be inferred if he holds

over and remains silent.'' (Taylor's Landlord and Tenant,
sec. 22.) ''The holding over may be upon a rent different
from that before reserved, though otherwise the terms are
the same. A contract for a different rent has been held to
arise when the landlord notifies the tenant that if he holds
over he must pay an increased rent, and the tenant makes
no reply and does hold over, this being regarded as an ac-
ceptance of the landlord's proposition. If, however, the ten-
ant protests against such increase, there can, by the cases
generally, be no implication of assent by him, and no greater
rent can be demanded than before. Occasional decisions and
*dicta* to the effect that even if the tenant objects to the pay-
ment of the increased rent, he will be liable therefor so long
as he retains possession, are objectionable, as in effect im-
puting to the tenant an intention which he expressly dis-
claimed, and as enabling the landlord to fix a penalty of
any amount for the wrongful holding over by the tenant.
It might indeed be questioned whether, in the ordinary case,
the tenant, by retaining possession even without objection
to the proposed increase of rent, intends to indicate assent
to such increase. The courts have, however, assumed that
he does so intend.'' (Tiffany on Landlord and Tenant, sec.
210; Jones on Landlord and Tenant, sec. 202, and cases cited
therein.)

A statement of account set out in the bill of exceptions,
which was furnished by the plaintiffs to the defendants in
January, 1907, shows that at the close of the year 1905, de-
fendants were indebted to plaintiffs in the sum of $1,165 on
the old account, or the account for the year 1905. On Feb-
ruary 2, 1906, the sum of $500 was credited to defendants,
and on May 14th an additional sum of $500 was so credited,
and on August 20th the sum of $1,000 was credited. It will
be noticed, therefore, that a part of the sum of $1,000 paid
by defendants on August 20th was made to apply upon the
new account commencing December 1, 1905. The court hav-
ing found that prior to that time the defendants had protested
against the injection of any new terms into the contract of
hiring, and there was some evidence upon which to found
this finding, it then appears that plaintiffs accepted money
which they applied on the rental account in the face of notice
from defendants that they would not be bound by the pro-

posed new terms in the lease contract. Up to this time, no doubt plaintiffs had the right to treat the defendants as trespassers, if they so elected to do, and oust them from the premises and recover from them the reasonable value of the use of the land during the period that the defendants had so held over. By the acceptance of money paid on account of rental, however, the plaintiffs must be held to have themselves elected to treat the defendants as tenants for the then current year, and having once so elected, that election would bind them for the remainder of that term, or until the first day of December, 1906. The occupancy by defendants of the land during the year 1907 appears to have been had under similar circumstances. In December, 1906, defendants wrote to plaintiffs a letter containing the following paragraph: "Do you want to lease us your farming land at Tehachapi for the coming season? If so, how much do you want for it? The land is in good condition to plow now and we are ready to begin plowing at once." On January 22d following, plaintiffs wrote to defendants as follows: "On December 27th we wrote you again and have received no reply. The same day you wrote us about leasing the land. We have not replied to this letter as we have been waiting to hear from you in reply to our letter. We certainly could make no arrangements to lease the land until our pending matters are straightened up." No agreement was reached respecting the rental of the land for the year 1907, and in the letters written by defendants to plaintiffs there is a continued objection expressed to paying according to the new terms sought to be imposed by the plaintiffs. In a letter of August 10th, written by defendants to plaintiffs, is found this phrase: "No one knows better than yourselves that no man can pay you ten cents per barrel for your stone very long and live." Again, in a letter dated October 24th defendants wrote: "Please tell us how we or anyone else could afford to pay you ten cents per barrel for stone and live. . . . We are willing to pay you full value and as much as anyone else will pay you for whatever business we do with you, but when you want more than that it is not in the cloth." It may be properly said that the conduct of defendants throughout their relations with the plaintiffs with respect to the leasing of this property and the payment of rental therefor was not

such as deserves any particular commendation. The whole course of action on the part of defendants seems to have been in the direction of temporizing, and in the face of the continued and repeated notification to them by the plaintiffs to either vacate the property, stop taking lime rock therefrom, or settle up their accounts, they continued to occupy and use the land, to manufacture lime therefrom and dispose of it in the market. On the other hand, plaintiffs, had they so desired, could have ejected defendants under proper process from their ground, or brought an action at any time to recover the reasonable value of the use of their property. This they failed to do, but continued to accept money and lime, which they placed to the credit of the defendants, and by so doing they adopted defendants as continuing tenants and estopped themselves from asserting any change in the lease contract. The conclusion of the trial court upon that branch of the case, upon the record as presented to us, must be sustained. We cannot adopt the view suggested by appellants, that the contract should not be treated as one for the leasing of lands, and therefore not subject to rules applicable to the relation of landlord and tenant. In the absence of a special limiting agreement, a lessee of lands for years or at will has the right to the product of the soil and also to work any quarries open at the commencement of his tenancy. (Civ. Code, sec. 819.) And the plaintiffs expressly alleged in their complaint that the land was leased for farming purposes and that defendants were to have the right to quarry lime rock on said lands. This latter right, so given defendants, was an incident to the main contract of leasing, and one which, under the code provision cited, would have resulted in defendants' favor, even though the contract had been silent as to it.

We think the court erred, however, in determining that a portion of the lime furnished by defendants to plaintiffs, and on which account the counterclaim is based, was to be paid for by plaintiffs according to the reasonable value thereof. This finding does not appear to be sustained by the evidence. It was admitted by all parties that for the first three carloads furnished, the price was to be $9 per ton f. o. b. Tehachapi. Six other carloads of lime were furnished subsequently.

After the first three had been furnished, the plaintiffs wrote to defendants as follows: "We would request that you bill us the lime at $12, delivered San Francisco, instead of $9 f. o. b. Tehachapi. The reason for that is that it keeps our books straight, as we are charging you the freight and sending you the expense bill." Following this letter, and on March 22, 1907, a telegram was sent by plaintiffs to defendants worded as follows: "Send at least five carloads of lime at once. When will they be shipped?" Defendants replied that they would ship all the lime wanted, but it would be some time before they could ship much. In the course of this letter written by them they made the statement that they were offered $11 and $12 per ton for lime at Tehachapi, and that $10 per ton would govern until further notice. At the time a carload was shipped on April 20, 1907, to the plaintiffs, defendants wrote as follows: "We have been besieged with offers from San Francisco for the past two months for all the lime we can make at $12 per ton f. o. b. Tehachapi. We presume you will allow us the prevailing San Francisco price for our lime, viz.: $12." To this letter plaintiffs made reply as follows: "Referring to your remarks about prices, beg to advise you to read our letter of January 31st, and to remember that you arranged with Mr. Cowell to ship us all your surplus output this season at $12 per ton delivered San Francisco. This we consider a contract, and shall adjust accounts accordingly." To this assertion as to the understanding had between the parties, defendants made no dissent, so far as the record discloses, either in the correspondence or in their oral testimony, and they proceeded to ship the lime to plaintiffs as requested. We think that defendants, when notified by plaintiffs that the account for lime furnished would be adjusted at the rate of $12 per ton delivered San Francisco (which was the same as $9 per ton f. o. b. Tehachapi, by deducting freight charges), and made no objection thereto or protest of any kind, became bound to accept payment at the rate stated.

For the reasons last given, the judgment and order must be reversed, and it is so ordered.

Allen, P. J., and Shaw, J., concurred.